**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------x
In re:                                      :    Chapter 11
                                            :
AMCAD HOLDINGS, LLC, et al.,                :    Case No. 14- 12168 (___)
                                            :
                            Debtors.¹       :    Joint Administration Requested
                                            :
-------------------------------------------------x
```
**Bid Procedures Hearing Date:  TBD
Bid Proc. Obj. Deadline: TBD
Sale Hearing: TBD
Sale Objection Deadline: TBD**

**MOTION OF DEBTORS FOR (I) ORDER (A) APPROVING
BIDDING PROCEDURES FOR SALE OF LAND RECORDS BUSINESS
ASSETS OF AMERICAN CADASTRE, L.L.C., (B) SCHEDULING FINAL SALE
HEARING FOR SALE OF SUCH ASSETS; (C) APPROVING EXPENSE
REIMBURSEMENT AND BREAK-UP FEE AND (D) APPROVING FORM AND
MANNER OF NOTICE THEREOF, AND (II) ORDER AUTHORIZING AND
APPROVING (A) SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS AND
OTHER INTERESTS AND (B) ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO SUCCESSFUL BIDDER**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**")
hereby submit this motion (this "**Motion**"), pursuant to sections 105(a), 363 and 365 of title 11
of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), Rules 2002, 6004,
6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"),
and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States
Bankruptcy Court for the District of Delaware (the "**Local Rules**"), by and through their
proposed counsel, for entry of (a) an order in substantially the form attached hereto as <u>Exhibit A</u>
(the "**Bidding Procedures Order**") (i) approving bidding procedures (the "**Bidding
Procedures**") in connection with the sale of the assets of American Cadastre, L.L.C.
("**AMCAD**" or "**Seller**") associated with its Land Records Business (collectively, the "**Assets**"),

---

¹   The Debtors in these chapter 11 cases, along with the last four digits of each entity's federal tax identification
number, are: AmCad Holdings, LLC (4731) and American Cadastre, L.L.C. (0897).  The corporate headquarters and
the mailing address for each entity listed above is 13650 Dulles Technology Drive, Suite 400, Herndon, VA 20171.

(ii) scheduling a final sale hearing (the "**Sale Hearing**") to consider entry of an order approving the sale of the Assets, (iii) approving a proposed break-up and expense reimbursement fee for a "stalking horse" bidder, and (iv) approving the form and manner of notice of the auction for the Assets (the "**Auction**") and the Sale Hearing (the "**Sale Notice**"); and (b) an order (the "**Sale Order**"), in substantially the form attached hereto as Exhibit C, authorizing and approving (i) the sale of such Assets free and clear of liens, encumbrances and other interests and (ii) subject to the terms of any successful bids received and accepted at the Auction, the assumption and assignment of executory contracts and unexpired leases to the successful bidder at the Auction.  In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      The Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code.  Such relief also is warranted under Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 and Local Rule 6004-1.

## BACKGROUND

### A.      The Chapter 11 Cases

2.      On September 19, 2014 (the "**Petition Date**"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").  The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of the Chapter 11

2

Cases, is set forth in the Declaration of Patrick Conley in Support of Chapter 11 Petitions and First Day Motions.

3.      The Debtors continue to manage their assets and operate their business as debtors in possession pursuant to Bankruptcy Code Sections 1107 and 1108.  No trustee or examiner has been requested in the Chapter 11 Cases, and no committees have yet been appointed.

**B.      The Debtors' Business**

4.      AMCAD is a software services company, providing software solutions and document services for both government and commercial enterprises.  AMCAD has historically offered four lines of products and services: (i) providing software and related services that allow for automation of government records offices, including both land and vital records (the "**Land Records Business**" or the "**Business**"); (ii) providing secure and compliant document services (microfilming, conversion, preservation) and compliance, physical document storage and rapid access to physical and electronic documents at AMCAD's Rock Island, Illinois facility (the "**Managed Services Business**"); (iii) providing a case management and document management software solution for electronic filing, primarily to state and county court systems (the "**e-Filing Business**"); and (iv) constructing case management systems for state and county court systems (the "**Justice Business**").  As described more fully on the Conley Declaration, the Debtors terminated the Justice Business on June 23, 2014.

5.      Substantially all of AMCAD's assets, including all of the Assets, are encumbered by pre-petition liens securing AMCAD's obligations under a pre-petition revolving credit facility (the "**Revolving Facility**") with Fifth Street Finance Corp. ("**Fifth Street**").  As of the Petition Date, the amount outstanding under the Revolving Facility, was approximately $5,793,800.27 including principal and accrued, unpaid interest, fees (including the Exit Fee described in the

pre-petition credit agreement), costs and expenses.  Fifth Street (the "**DIP Lender**") has agreed

to provide the Debtors with debtor-in-possession financing (the "**DIP Financing**").  Fifth Street

supports the sale of the Assets and has been fully apprised of the efforts described below

undertaken by the Debtors and their advisors to market and sell the Assets.

**C.     The Pre-Petition Marketing Effort**

6.     On July 10, 2014, Debtors hired SOLIC Capital Advisors, LLC ("**SOLIC**") as

their financial advisors to provide an initial review and assessment and financial advisory

services, including the evaluation and execution of strategic alternatives.  Upon retention, SOLIC

performed extensive diligence regarding the Debtors' financial and operating condition,

ultimately concluding that the best strategy to maximize value for all constituents was to market

each Business individually.  Immediately thereafter, and at the direction of the board of directors,

SOLIC began identifying potential strategic and financial buyers, preparing marketing materials,

and populating an electronic data room (the "**Data Room**"), which contains significant

information about each of the Businesses being marketed.

7.     SOLIC identified a total of twenty-six (26) strategic and twenty-nine (29)

financial buyers that would likely be interested in potentially acquiring any, or all, of the Assets.

On July 15, 2014, SOLIC began actively marketing the Assets and sent teasers and non-

disclosure agreements to the fifty-five (55) strategic and financial buyers.  After receipt of a

teaser describing the opportunity, twenty-two (22) parties executed non-disclosure agreements in

order to conduct the necessary due diligence associated with a possible acquisition.  To facilitate

the diligence process, SOLIC distributed a Confidential Information Presentation ("**CIP**") to

these parties and provided access to the Data Room.  SOLIC has responded to requests for

additional information from various parties relative to the Assets in which they have stated an

interest.

4

8.      Thereafter, SOLIC facilitated in-person meetings with potential buyers of the Land Records Business, Managed Services Business, and e-Filing Business, and AMCAD's management, at both the Rock Island and Herndon facilities, to provide a better understanding of the Assets to be acquired.  As part of the meetings, the buyers were given the opportunity to assess the management teams and personnel.

9.      Subsequent to the site visits, SOLIC negotiated the terms of the Asset Purchase Agreements with each of the remaining prospective buyers, asking for receipt of final mark-ups to the agreements and pricing confirmation by September 6, 2014.  Of the six (6) remaining interested parties, three (3) buyers submitted finals offers: two for the Land Records Business, and one for the e-Filing Business. SOLIC continues to work with other various potential purchasers in an effort to solicit competing bids for the remaining Assets.

10.      Based on the submission of the final Asset Purchase Agreements, the board approved AMCAD's entry into an Asset Purchase Agreement (the "**Klass APA**") with Klass Software Corporation ("**Klass**" or "**Purchaser**" or "**Buyer**"), designating Klass as the "stalking horse bidder" for the Land Records Business.  The Klass APA is further described below and attached hereto as Exhibit B.

11.      The Debtors and their professionals continue to negotiate with various parties regarding the sale of the Managed Services Business, e-Filing Business and Justice Business and anticipate bringing separate motions to sell those assets.

12.      The Debtors have determined, in their business judgment, that the best way to maximize the value of their business and assets is to sell the to the bidder(s) making the highest or otherwise best bids for such Assets.  The Debtors will undertake to sell the Assets either collectively or individually in order to maximize the value of their Assets.

53126/0001-10981195v2

**RELIEF REQUESTED**

13.     By this Motion, the Debtors request entry of (a) the Bidding Procedures Order (i) approving Bidding Procedures in connection with the sale of the Assets, (ii) scheduling the Sale Hearing to consider entry of an order approving the sale of the Assets, (iii) approving a break-up fee and expense reimbursement for a stalking horse bidder, and (iv) approving the form and manner of notice of the Auction for the Assets and the Sale Hearing; and (b) an order authorizing and approving (i) the sale of the Assets free and clear of liens, encumbrances and other interests and (ii) subject to the terms of any successful bids received and accepted at the Auction, the assumption and assignment of executory contracts and unexpired leases to the successful bidders at the Auction.

**THE PROPOSED BIDDING PROCEDURES**

**A.     Summary of Proposed Bidding Procedures**

14.     The Debtors seek to conduct an open sale process pursuant to which the winning bidder will enter into an asset purchase agreement, substantially in the form of the Klass APA, to purchase substantially all of the Assets free and clear of all liens, claims, encumbrances and interests.

15.     The Bidding Procedures (summarized below) were developed to address the Debtors' need to proceed with an expedited sale process to preserve the going-concern value of their assets, but with the objective of promoting active bidding that will result in the highest and best offer for the Assets, while affording appropriate stalking horse protections to the Purchaser.

16.     Additionally, the Bidding Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Assets by financially-capable, motivated bidders who are likely to close on the Sale.  Therefore, and in

view of the extensive and robust pre-petition marketing and sale process, it is critical to proceed toward an Auction as expeditiously as possible in order to ensure a speedy and seamless transaction that best serves employees, creditors, customers and other parties-in-interest.

17.     The following briefly summarizes certain provisions and/or key aspects of the Proposed Bidding Procedures, as well as any provisions required to be highlighted under Local Rule 6004-1(c):

| Term | Description[2] |
|---|---|
| **Provisions Governing the Qualification of Bidders** | All parties wishing to participate must become an "Eligible Bidder" no later than one (1) day after entry of the Bidding Procedures Order.<br><br>An Eligible Bidder must deliver to the Debtors, the DIP Lender and any Committee:<br>• An executed Confidentiality Agreement; and<br>• Written evidence of financial wherewithal satisfactory to the Debtor and its advisors |
| **Provisions Governing Qualified Bids** | All bids must contain the following to be considered Qualified Bids:<br>   (i)  An asset purchase agreement, fully executed by the Eligible Bidder in a clean copy and marked to show the proposed changes to the Klass APA in a redlined copy, that further:<br>       (A)  Identifies the Eligible Bidder and any members of its investor group, if applicable;<br>       (B)   Is not subject to any conditions, representations, or terms that deviate from those in the Klass APA and/or that the Debtor determines to be unacceptable;<br>       (C)  Is not conditioned on the Bankruptcy Court's approval of any bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment;<br>       (D)  Does not contain any financing or due diligence contingencies to closing of the Proposed Transaction;<br>       (E)  Includes a commitment to close no later than fifty (50) days after the Petition Date (the "Closing Date");<br>       (F)   Does not contain any condition to closing of the Proposed Transaction relating to the receipt of any third party approvals (excluding required Bankruptcy Court approval); |

---

[2] Capitalized terms used in this table and undefined elsewhere in this Motion have the meaning set forth in the proposed Bidding Procedures, attached as <u>Exhibit 1</u> to the proposed Bidding Procedures Order.

(G)  Expressly acknowledges and represents that the Eligible Bidder: (1) has had an opportunity to conduct any and all due diligence regarding the Proposed Transaction prior to making its bid, (2) has relied solely on its own independent review, investigation and/or inspection of any documents in making its bid or that of any of its legal, financial or other advisors, and (3) did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtor or the Proposed Transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the asset purchase agreement ultimately accepted and executed by the Debtors;

(H)  Identifies each and every executory contract and unexpired lease that the Eligible Bidder desires the Debtor to assume and assign at the closing and provides evidence of such Eligible Bidder's ability to provide adequate assurance of future performance of such contracts or leases (as required by section 365(f)(2)(B) of the Bankruptcy Code); and

(I)  Contains other information reasonably requested by the Debtor and its advisors.

(ii)  A purchase price in cash, payable in immediately available funds, equal to or greater than the purchase price set forth in Section 3.3 of the Klass APA, plus (a) a break-up fee and expense reimbursement of $120,000.00 in favor of the Stalking Horse Bidder (the "Break-Up Fee and Expense Reimbursement") and (b) an overbid in the amount of $200,000.00, for a total minimum purchase price of $5,020,000 (collectively, the "Initial Overbid Amount");

(iii)  A letter stating that the bidder's offer is irrevocable until the closing on the transaction with the Successful Bidder;

(iv) An earnest money cash deposit, which shall be delivered to Debtor's counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A., in the amount of not less than ten percent (10%) of the Initial Overbid Amount, which amount shall be held in a non-interest bearing account in accordance with these Bidding Procedures;

(v) Written evidence of fully committed and firm financing or other ability to consummate the Proposed Transaction, in each case acceptable to the Debtor; and

(vi) Written evidence that the bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the

| | submission of its bid and the execution of the agreements associated therewith, or a representation that no such authorization or approval is required. |
|---|---|
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder** | The Proposed Bidding Procedures Provide the following Bid Protections:<br>• A Break-Up Fee and Expense Reimbursement of $120,000; and<br>• An overbid amount of $200,000. |
| **Modification of Bidding and Auction Procedures** | The Debtors may conduct the Auction and adopt rules for the bidding process in the manner that they, in their reasonable judgment, determine will result in the highest, best or otherwise financially superior offer(s) for the Purchased Assets that is not materially inconsistent with any of the other provisions hereof, the Klass APA, the Bidding Procedures Order or any Bankruptcy Court order.  In any event, such rules will provide that, among other things: (i) the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other participating Qualified Bidder; (ii) all bids will be made and received in one room, on an open basis, and all other bidders will be entitled to be present for all bidding with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction; and (iii) each Qualified Bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction. |
| **Closing With Alternative Backup Bidders** | If, for any reason, the Successful Bidder fails to consummate the purchase of the Purchased Assets, the Back-Up Bidder will automatically be deemed to have submitted the highest or best bid and the Debtor shall be authorized to effect the sale of the Purchased Assets to the Back-Up Bidder and the Back-Up Bidder shall be directed to purchase the Purchased Assets as soon as is commercially reasonable without further order of the Bankruptcy Court. |

18.    Pursuant to Local Rule 6004-1(c)(ii): (a) each bidder participating in the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale; (b) the Auction will be conducted openly, but only the Debtors, Fifth Street, any statutory committee, the Purchaser and Qualified Bidders who have timely submitted a Qualified Bid (and professional advisors to each of these parties) may attend the Auction; (c) bidding at the

Auction will be transcribed.  The Bidding Procedures are typical for asset sales of this size and nature.

**B.**     **Break-Up Fee and Expense Reimbursement**

19.     The Debtors seek approval to pay the Purchaser the Break-Up Fee and Expense Reimbursement upon the terms and conditions set forth in the Klass APA.

20.     Specifically, if the Purchaser is not the Successful Bidder, upon consummation of a transaction resulting in the transfer of the Assets to a party other than the Purchaser, and provided the Purchaser is not in breach of the Klass APA, the Debtors will pay the Purchaser a break-up fee and reimbursement of Purchaser's out-of-pocket costs and other expenses incurred in connection with the transaction contemplated by the Klass APA of $120,000 (the "**Break-Up Fee and Expense Reimbursement**").  *See* Klass APA at § 6.2(a)(vi).

21.     The Break-Up Fee and Expense Reimbursement is provided in recognition of Purchaser's expenditure of time, energy and resources in negotiating and entering into the Klass APA and the benefits to the Debtors' estates of having a "stalking horse" bidder.  Without the Break-Up Fee and Expense Reimbursement, the Purchaser would not have executed the Klass APA.

**C.**     **Notice of Sale Hearing, Auction, Bidding Procedures and Objection Dates**

22.     The Debtors propose that the deadline for qualifying bids be the date that is **ten (10) days** following entry of the Bidding Procedures Order (the "**Bid Deadline**").

23.     The Debtors further propose to hold the Auction at the offices of Cole, Schotz, Meisel, Forman & Leonard, P.A., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 commencing at 10:00 a.m. (prevailing Eastern time) on the date that is **two (2) days** following the Bid Deadline.

24.     The Debtors further request that the Court schedule the Sale Hearing on the date that is **two (2) days** following the Auction.

25.     Within **two (2) days** of entry of the Bidding Procedures Order, the Debtors will cause to be served by first class mail, postage prepaid, copies of the *Notice of Bid Deadline, Auction and Sale Hearing in Connection with the Sale of Substantially All of the Debtors' Assets* (the "**Sale Notice**") attached to the proposed Bidding Procedures as Exhibit 2, upon the following entities in accordance with Local Rule 2002-1(b): (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to Fifth Street; (iii) counsel to the Purchaser; (iv) all parties that have expressed an interest in purchasing the Land Records assets; (v) the twenty (20) largest unsecured creditors of AMCAD or counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases, as applicable; (vi) all parties whose rights may be affected by the Sale, including counterparties to executory contracts and unexpired leases that may be assumed and assigned in connection with the Land Records sale transaction; and (vii) parties entering an appearance in these cases pursuant to Bankruptcy Rule 2002(i).

26.     Within three (3) days after entry of the Bidding Procedures Order, the Debtors shall cause the Sale Notice to be published in one daily edition of the *Washington Post*, national edition, or such other national publication selected by the Debtors.

27.     The Sale Notice includes a provision that the Assets shall be sold free and clear of all mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens (including, without limitation, mechanics', materialmens' and other consensual and non-consensual liens and statutory liens), judgments, demands, encumbrances, rights of first refusal, offsets, contracts, recoupment, rights of recovery, claims for

reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, pension or tax, decrees of any court or foreign or domestic governmental entity, or charges or interests of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts or failures to act, of the Debtors or the Debtors' predecessors or affiliates, claims (as that term is used in the Bankruptcy Code), reclamation claims, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the Petition Date and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability (collectively, "**Liens, Claims, Encumbrances and Interests**"), with such Liens, Claims, Encumbrances and Interests to attach to the net proceeds of the Sale.

28.     The Debtors further request that objections, if any, to the Sale Motion or the relief requested therein (the "**Sale Objections**") must be filed no later than 4:00 p.m. (prevailing Eastern Time) on the date that is **four (4) days** prior to the Sale Hearing (the "**Sale Objection Deadline**").   Any party failing to timely object to the Sale Motion on or before the Sale Objection Deadline shall be precluded from asserting any objection to the relief sought therein.

29.     The Debtors submit that the foregoing notice is reasonably calculated to provide timely and adequate notice to the Debtors' creditors and other parties-in-interest, along with

parties that have express interest (or may express interest) in bidding on the Acquired Assets, of

the Bidding Procedures, the Auction, the Sale and all proceedings to be held thereon.

**PROPOSED SALE**

**A.      Terms of Proposed Sale of the Land Records Business**

30.      The following briefly summarizes certain provisions and/or key aspects of the

Klass APA, as well as any provisions required to be highlighted under Local Rule 6004-1(b)(iv):

| Term[3] | Description[4] |
|---|---|
| **Purchase Price** (§ 3.3) | $4,700,000 |
| **Good Faith Deposit** (§ 3.2) | $470,000 to be held by the Escrow Agent pursuant to the Escrow Agreement. |
| **Competitive Bidding/Auction** (§ 6.2) | The Klass APA contemplates an Auction to be conducted in accordance with the Bidding Procedures Order |
| **Acquired Assets** (§ 2.1) | The Assets to be sold are substantially all of the Assets associated with the Land Records Business, other than the Excluded Assets.<br><br>The Purchased Assets include all assets of the Land Records Business, including, but not limited to:<br><br>• All equipment leases (the "Equipment Leases") set forth in Schedule 2.1(b), but specifically excluding any Removed Equipment Leases under Section 2.5 (the "Assumed Equipment Leases");<br>• All furniture, fixtures, equipment, supplies and other tangible personal property owned by Seller for use in the Business together with all warranties, licenses, releases, service agreements and contractual commitments, if any, express or implied, existing for the benefit of any Seller in connection therewith (collectively, the "Equipment"), but specifically excluding any Excluded Equipment |

---

[3] The Debtors submit that the neither the Klass APA nor the proposed order approving the Sale contain any provisions implicated by Local Rule 6004-1(b)(iv) (A) (sale to insider); (B) (agreements with management); (C) (releases); (G) (interim arrangements); or (H) (use of proceeds).

[4] Capitalized terms used in this table and undefined elsewhere in this Motion have the meaning set forth in the Klass APA.

(the "<u>Acquired Equipment</u>");

- All licenses, permits, franchises and other authorizations of any Governmental Entity relating to the Purchased Assets and to the operation of the Business, and all pending applications therefor (collectively, the "<u>Permits</u>"), but specifically excluding any Excluded Permits (the "<u>Acquired Permits</u>"), to the full extent, if any, such Acquired Permits are transferable or assignable;

- All Contracts and rights thereunder of Seller with respect to the Business (other than Equipment Leases, and Intellectual Property, which are specifically covered by paragraphs (b) and (i) of this Section 2.1), which are set forth on Schedule 4.8, but specifically excluding any Removed Contracts under Section 2.5 (the "<u>Assumed Contracts</u>");

- With respect to the Land Records Unit, all accounts receivable and all other rights of Seller to payment, including credit card receivables ("<u>Accounts Receivable</u>"), all other rights of Seller to receive payment in respect of any Claims with respect to the Land Records Unit and all rights in respect of prepaid items however evidenced, whether by notes, instruments, chattel paper or otherwise with respect to the Land Records Unit, but specifically excluding Avoidance Actions and Excluded Claims;

- Subject to Section 6.3(b), to the extent the transfer to Buyer is not prohibited by Law (giving effect to any obtained Orders or consents to transfer), copies or originals of all books, records, files or papers of Seller, whether in hard copy or electronic format, relating to the Purchased Assets or to the on-going operation of the Business, including, sales and promotional literature, manuals and data, sales and purchase correspondence, customer lists, vendor lists, mailing lists, catalogues, research material, know-how, specifications, designs, drawings, processes and quality control data, if any, or any other intangible property and applications for the same, engineering information, test results, plans, personnel and employment records (other than records with respect to former employees or employees who do not become employees of Buyer as of or after the Closing Date or which Seller is prohibited by Law to transfer), technical information, diagrams, maintenance schedules, operating and production records, safety and environmental reports, data, studies and documents, fixed

| | |
|---|---|
| | asset ledgers, Tax Returns (other than income Tax Returns) regarding real property, personal property and *ad valorem* taxes with respect to the Purchased Assets, including any exemption or abatement agreements or certifications and supporting documentation for such Tax Returns; |
| | • The Intellectual Property owned by or licensed to Seller used or held for use in the Business, including the Intellectual Property listed on <u>Schedule 2.1(i)</u> and any accrued claims or causes of action to enforce or protect any such Intellectual Property, but specifically excluding the Excluded Intellectual Property (the "<u>Acquired Intellectual Property</u>"); |
| | • The amount of and all rights to any insurance proceeds received or entitled to be received by Seller after the date hereof related to any of the Purchased Assets; |
| | • All rights of Seller under all warranties (expressed or implied), representations, indemnities, or guaranties made by third parties to or for the benefit of Seller with respect to the Purchased Assets; |
| | • All rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees and agents of Seller or with third parties (including, without limitation, any non-disclosure or confidentiality, non-compete, or non-solicitation agreement entered into in connection with the Auction). |
| | • Other than Excluded Assets, all other properties, assets and rights that are not expressly excluded herein of every nature, tangible and intangible, real or personal, now existing or hereafter acquired, owned by Seller, or used or held by Seller for use in the Business, or as may, in Buyer's reasonable opinion be necessary to conduct the Business, whether or not reflected on the books or financial statements of the Seller, as the same shall exist at the Closing Date; and |
| | • All goodwill related to the foregoing. |
| **Excluded Assets** (§ 2.2) | The Excluded Assets are: |
| | • All Cash and Cash Equivalents as of the Closing Date; |
| | • All assets of the Managed Services Unit, the CMS Unit, and eUniversa Product, including but not limited to, any contracts, leases, intellectual property, books and records and claims with respect to the Managed Services Unit, the CMS Unit, and eUniversa Product; |

15

- Any Contracts other than the Assumed Contracts, the Assumed Equipment Leases, the Assumed Real Property Leases or the Acquired Intellectual Property;

- All rights, demands, claims, actions and causes of action (collectively, the "Claims") that Seller may have against any third party, including any Governmental Entity, under Chapter 5 of the Bankruptcy Code (collectively, the "Avoidance Actions");

- All Claims that Seller may have against any Person (including Governmental Entities) for refund or credit of any type with respect to Taxes accrued with respect to periods ending on or prior to the Closing Date;

- All Claims against any Person (other than Buyer and its Affiliates) solely with respect to any Excluded Assets, other than Accounts Receivable with respect to Excluded Assets (the "Excluded Claims");

- Except as provided in Section 2.1(j), all insurance policies, insurance claims and proceeds of insurance policies owned by Seller;

- Loans owed to any Seller by any employee or director of any Seller and any intercompany loans;

- All rights of any Seller under this Agreement, the Escrow Agreement and the agreements and instruments delivered to Seller by Buyer pursuant to this Agreement or the transactions contemplated hereby;

- The company seal, minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence or capitalization of Seller;

- Seller's directors and officers liability insurance policy, executive or incentive compensation, bonus, deferred compensation, pension, profit sharing, savings, retirement, stock option, stock purchase, group life, health or accident insurance or other Benefit Plan;

- The Seller's website, domain names and all related content and Intellectual Property;

- Assets owned or used by Seller not related to the Business which are specifically identified on Schedule 2.2(m);

- Any Intellectual Property that is specifically identified on Schedule 2.2(n) (the "Excluded Intellectual Property");

- Any security, vendor, utility or other deposits, including (i) any security deposits (including bank letters of credit) given in favor of lessors

| | |
|---|---|
| | of real property, (ii) any rights to receive from such lessors unpaid construction allowances, (iii) any prepaid expenses in excess of actual expenses from whatever source, including deposits on bonds for sales taxes, customs and utilities, and (iv) any other cash due and owing any Seller in respect of such leases owed to Seller by such lessor prior to the Closing Date; <ul><li>All vehicles owned by the Seller;</li><li>Any other assets that Buyer elects in writing, which election shall be made in accordance with Section2.5 in the case of Property Leases, Equipment Leases, Contracts and Intellectual Property, to exclude from Purchased Assets (it being understood that there will be no adjustment to the Purchase Price with respect thereto);</li><li>All capital stock of Seller, including any options, warrants or other securities exchangeable or convertible into capital stock of any Seller; and</li><li>Seller's bank accounts.</li></ul> |
| **Sale of Avoidance Actions** (§ 2.2(d)) | Avoidance actions are not being sold. |
| **Assumed Liabilities** (§ 2.3) | The Assumed Liabilities include: <ul><li>Post-Petition Accounts Payable with respect to the Business;</li><li>Cure Amounts;</li><li>Identified Employees PTO Payables with respect to Hired Employees;</li><li>Deferred Revenue Liabilities as of the Closing Date; and</li><li>all Liabilities of Seller which arise after the Closing Date to the counter-parties under the Assumed Contracts, the Assumed Equipment Leases and the Acquired Intellectual Property.</li></ul> |
| **Excluded Liabilities/Limits on Successor Liability** (§§ 2.4 and 4.6; ¶ __ of the Proposed Order) | Other than the Assumed Liabilities, Buyer shall not assume any other Liability whatsoever (including Liabilities relating to the conduct of the Business or to the Purchased Assets (and the use thereof) at any time on or prior to the Closing Date), whether relating to or arising out of the Business or Purchased Assets or otherwise, fixed or contingent, disclosed, or undisclosed (collectively, the "Excluded Liabilities"). <br><br> Title to the Assets is to be delivered free and clear of all Liens to the fullest extent permitted under Section 363(f) of the Bankruptcy Code. <br><br> The Proposed Order provides for the sale of the Assets free and clear of all liens, claims, encumbrances and interests, including any claims premised upon a theory |

| | |
|---|---|
| | of successor liability pursuant to 11 U.S.C. § 363(f). |
| **Closing Deadlines**<br>(§ 8.1(b)) | The Buyer may terminate the Klass APA<br>• if, 50 days after the Petition Date, the Closing has not occurred, provided Buyer is not in material breach of any of its representations and warranties contained in Klass APA;<br>• if, 25 days after the Petition Date, the Bankruptcy Court does not enter the Bidding Procedures Order or the Bidding Procedures Order is reversed, modified, or amended without the consent of the Buyer;<br>• if, 46 days after the Petition Date, the Approval Order is not entered. |
| **Tax Exemption**<br>(§ 6.8) | The Klass APA contemplates that all Transfer Taxes shall be paid by Buyer to the extent no exemption from Transfer Taxes is available. |
| **Record Retention**<br>(§ 6.3(b)) | The Klass APA provides that Seller shall have reasonable access during normal business hours to the books and records pertaining to the Purchased Assets and Assumed Liabilities and, to the extent that Seller is in possession of such information, books and records pertaining to the Excluded Assets and Excluded Liabilities.  Buyer shall cooperate with Seller as may reasonably be requested by Seller for such purposes. Seller's rights are fully assignable by Seller to any estate representative, including without limitation an official committee, trustee, litigation trust or similar Person empowered by the Bankruptcy Court or applicable law to discharge any administrative rights or duties in the Cases. |
| **Representations and Warranties**<br>(Articles IV and V)<br>**Indemnity**<br>(Article IX) | Both Buyer and Seller have made standard commercial representations and warranties.<br><br>Seller indemnifies and holds Buyer harmless with respect to breaches of representations, warranties and covenants, pre-Closing Date taxes and claims for intentional breach and fraud or intentional misrepresentation.  The sum of $470,000 will be held at the Closing Date with respect to the indemnification. Claims against the hold back have to be made within 45 days from the Closing Date. |
| **Relief from Bankruptcy Rule 6004(h)** | *See infra.* |

18

**C.      Notice Relating to Potential Assumption and Assignment of Contracts**

31.      As part of the Sale, the Debtors may seek authority to assume and assign executory contracts and/or unexpired leases (the "**Assumed Executory Contracts**") to the Purchaser or another successful bidder.  The Debtors do not believe that there will be any monetary defaults outstanding under any Assumed Executory Contract.

32.      Despite the unlikelihood of any monetary defaults under prospective Assumed Executory Contracts, the Debtors propose that, on or before the date that is **five (5) days** following entry of the Bidding Procedures Order, the Debtors will file with the Court and serve on each party to an Assumed Executory Contract a notice setting forth the amount of cure owed thereunder according to the Debtors' books and records (the "**Cure Notice**").  The Cure Notice shall state the cure amount that the Debtors believe is necessary to assume such contract or lease pursuant to Bankruptcy Code Section 365 (the "**Cure Amount**"), if any, and notify each party that such party's lease or contract may be assumed and assigned to the successful bidder to be identified at the conclusion of the Auction.

33.      The Debtors further propose that any objection to the Cure Amount be filed no later than 4:00 p.m. (prevailing Eastern Time) on or before the date that is **four (4) days** prior to the Sale Hearing.  Any objection to the Cure Amount must state with specificity what cure the party to the Assumed Executory Contract believes is required with appropriate documentation in support thereof.  If no objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in any Assumed Executory Contract or other document as of the date of the Cure Notice.

**BASIS FOR RELIEF**

A.    **Conducting the Auction Pursuant to the Bidding Procedures is in the Best Interests of the Debtors' Estates**

34.    The proposed Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.  The Debtors believe that the Bidding Procedures are: (a) sufficient to encourage bidding for the Assets; (b) consistent with other procedures previously approved by this Court; and (c) appropriate under the facts of this case, including the fulsome process undertaken before the Petition Date, and relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  The Bidding Procedures are designed to prevent any chilling of potential bids. Further, the Bidding Procedures are designed to maximize value for the Debtors' estates while ensuring an orderly sale process.

35.    Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  In re S.NA. Nut Co., 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995).  See, also, In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); The Comm. of Asbestos-Related Litigants and/or Creditors vs. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) (stating that "a presumption of reasonableness attaches to a debtor's management decisions").

36.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate.  See, e.g., In re Integrated Res., 147 B.R. at 656-57 (noting that overbid procedures and break-up fee

arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

37.     The paramount goal in any proposed auction of property of the estate is to maximize the proceeds received by the estate.  See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (noting that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Res., 147 B.R. at 659 ("It is a well established principle of bankruptcy law that the ... [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

38.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. See, e.g., In re Integrated Res., 147 B.R. at 659 (explaining that such procedures "encourage bidding and [] maximize the value of the debtor's assets"); In re Fin. News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991), (stating that "court-imposed rules for the disposition of assets. .. [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

39.     The Debtors believe that the Bidding Procedures will establish the parameters under which the value of the proposed sale may be tested at the Auction.  Indeed, the Bidding Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtors' estates.  The proposed procedures further contain terms typical for a

process through which a sale of this nature is consummated and will increase the likelihood that the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

40.    As additional support, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  As described above, approval of the Bidding Procedures will greatly assist the Debtors in maximizing the value that they may obtain for all or portions of the Assets.  Consequently, the Debtors respectfully submit that granting the requested relief is appropriate under the circumstances.

**B.    The Break-Up Fee and Expense Reimbursement is in the Best Interests of the Debtors' Estates**

41.    A bid incentive such as the Break-Up Fee and Expense Reimbursement encourages a potential buyer to invest the time, money, energy and resources required to negotiate with a debtor, and perform the necessary due diligence to consider the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. The Debtors submit that approval of the Break-Up Fee and Expense Reimbursement is justified by the facts and circumstances of these cases, whether considered under the business judgment rule or as an administrative expense claim of the estates.

42.    Moreover, the Break-Up Fee and Expense Reimbursement is a material inducement for, and conditions of, the Purchaser's entry into the Klass APA.  The Debtors believe that the Break-Up Fee and Expense Reimbursement is fair and reasonable in view of (a) the analysis and negotiation undertaken by the Purchaser in connection with the transaction and (b) the fact that, if the Break-Up Fee and Expense Reimbursement is triggered, Purchaser's

efforts will have influenced the chances that the Debtors will receive the highest and best offer for the Assets, to the benefit of the Debtors' estates and all parties in interest.

43.     The United States Court of Appeals for the Third Circuit has held that although bidding incentives in favor of a stalking horse are measured against a business judgment standard, in order to receive administrative expense priority pursuant to section 503(b) of the Bankruptcy Code, the bidding incentive must provide some post-petition benefit to the estate. See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999). The O'Brien Court identified two instances in which such a benefit to the estate may be found.   First, a benefit may be found if the incentive promotes a more competitive bidding process, "such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537.   Second, a benefit may be found where bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as the floor bid upon which other bidders can rely. See id.

44.     In recognition of the expenditure of time, energy and resources as well as the benefits to the Debtors' estates of securing a "stalking horse" or minimum bid, the Debtors have agreed to seek approval of the Break-Up Fee and Expense Reimbursement.  The Debtors' ability to offer the Break-Up Fee and Expense Reimbursement enables the Debtors to ensure the sale of the Assets to a contractually-committed bidder at a price the Debtors believe to be fair while, at the same time, providing the Debtors with the potential of a greater return to the estates. Moreover, the Purchaser will continue to spend considerable time, money and energy pursuing the Sale and has engaged in extended good faith negotiations under extremely stressful time pressure. The Debtors and the Purchaser are not related, and each has acted in good faith throughout this process.

45.     Moreover, the amount of the Break-Up Fee and Expense Reimbursement, totaling approximately 2.5% of the purchase price for the Assets, is reasonable and appropriate in light of the size and nature of the sale of the Assets and the efforts that have been and will continue to be expended by Purchaser.  See, e.g., In re Fin. News Network, 980 F.2d 165, 167 (2d Cir. 1992) (approving over 5% break-up fee); O'Brien., 181 F.3d at 536 (noting that combined break-up fee and expense reimbursement of approximately 4-5% was "within the range of fees approved by some courts").

46.     The Purchaser has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the Debtors will receive the best possible price for the Assets. Moreover, the Debtors' customers, suppliers and employees will take comfort that the Klass APA will ensure the continuation of the Land Records Business as a going concern. Furthermore, approval of the Bidding Procedures, including the Break-Up Fee and Expense Reimbursement, is required by the Klass APA as a condition of Klass's obligation to proceed with the transaction.

47.     Payment of the Break-Up Fee and Expense Reimbursement should not diminish the assets of the Debtors' estates available for distribution to creditors.  The Debtors do not intend to terminate the Klass APA if to do so would incur an obligation to pay the Break-Up Fee and Expense Reimbursement, unless to accept an alternative bid, which bid must exceed the consideration offered by the Purchaser by an amount sufficient to pay the Break-Up Fee and Expense Reimbursement.

48.     In sum, the Debtors' ability to offer the Break-Up Fee and Expense Reimbursement to Purchaser enables the Debtors to ensure the sale of the Assets to Purchaser at a price they believe to be fair, while, at the same time, preserving the value of their estates and

24

promoting more competitive bidding. The Debtors' payment of the Break-Up Fee and Expense Reimbursement under the circumstances herein would be (a) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of Bankruptcy Code section 503(b); (b) of substantial benefit to the Debtors' estates; and (c) reasonable and appropriate in light of the efforts and the due diligence costs and expenses that have been and will be expended by the Purchaser. Thus, the Debtors request that the Court authorize payment of the Break-Up Fee and Expense Reimbursement, pursuant to the terms and conditions of the Klass APA.

**C.      Section 363(b) of the Bankruptcy Code Authorizes the Sale of Assets Under the Circumstances Present Here**

49.      Under section 363 of the Bankruptcy Code, a debtor-in-possession may sell property of its estate outside of the ordinary course of its business, subject to the approval of the court after notice and a hearing. See 11 U.S.C. § 363(b)(1). In the Third Circuit and elsewhere, it is well settled that a decision to sell assets outside the ordinary course of business, prior to confirmation of a plan, is based upon the sound business judgment of the debtor. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing, In re Schipper, 933 F.2d 513 (7th Cir. 1991)); In re W. R. Grace & Co., 475 B.R. 34, 77-78 (D. Del. 2012); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991). See, also, Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Off'l Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Stephens Indus. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) ("bankruptcy court can authorize a sale of all a Chapter 11 Debtor's assets under [section] 363(b)(1) when a sound business purpose dictates such action."); In re Johns-Manville Corp., 60 B.R. at 616 ("Where the Debtor articulates a reasonable basis for its business decisions (as distinct from a decision made

arbitrarily or capriciously), courts will generally not entertain objections to the Debtor's conduct.").

50.     Courts consider the following non-exhaustive list of factors in determining whether a sound business purpose exists: (a) sound business reason for the sale; (b) accurate and reasonable notice; (c) proportionate value of the asset to the estate as a whole (fair and reasonable); (d) the amount of elapsed time since the filing; (e) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (f) the effect of the proposed disposition on the future plan; (g) the amount of proceeds to be obtained from the sale versus the appraised value of the property sold; and (h) whether the asset is decreasing or increasing in value. In re Lionel Corp., 722 F.2d at 1071; Delaware & Hudson Ry., 124 B.R. at 176; In re Weatherly Frozen Food Group, Inc., 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992). A debtor's showing of sound business justification need not be unduly exhaustive. Rather, a debtor is "simply required to justify the proposed disposition with sound business reason." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

51.     Here, each of these factors is satisfied. First, sound business reasons exist for the Debtors' efforts to sell the Assets in the proposed manner. The Debtors and their advisors have analyzed the options for the Debtors' business and determined that an expedited sale of the Debtors' remaining Assets is the only viable alternative. The Debtors believe that the sale process proposed in the Motion will maximize the recovery on the Debtors' remaining Assets and therefore is in the best interests of the Debtors' estates, creditors and other parties in interest.

52.     Second, as discussed elsewhere in this Motion, the Debtors will provide adequate and reasonable notice of the opportunity to bid on the Assets and of the opportunity to object to the Sale of the Assets to all known potentially interested parties. See, e.g., Folger Adam Security

Inc. v. DeMatteis/MacGregor, 209 F.3d 252, 265 (3d Cir. 2000) (stating that notice is sufficient

if it includes "the time and place of any public sale, the terms and conditions of any private sale,

states the time for filing objections and, if real estate is being sold, provides a general description

of the property"); WBQ P'ship v. Commw. of Va. Dept. of Med'l Assistance Svcs. (In re WBQ

P'ship), 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) ("'notice is sufficient if it includes the terms

and conditions of the sale, if it states the time for filing objections, and if the estate is selling real

estate, it generally describes the property'") (quoting In re Karpe, 84 B.R. 926, 929 (Bankr. M.D.

Pa. 1988)).

53.     Third, the Bidding Procedures proposed herein will provide for an open and

competitive bidding process for the Assets that will ensure that the value of the Assets is

maximized.  Fourth, the Debtors are proceeding in good faith and will make a showing at the

Sale Hearing that the purchasers of the Assets have acted in good faith and are entitled to

protection under section 363(m) of the Bankruptcy Code in the event that the orders approving

the sales are reversed or modified on appeal.

54.     Finally, the Debtors have commenced these cases because their cash resources are

limited and have determined that a sale of the Assets (along with all other remaining assets) is

the only viable means to preserve the value of those Assets and protect the interests of all

stakeholders, including the Debtors' creditors and the employees whose jobs will be preserved

through the sale of the Assets.

**D.      The Proposed Sale is for a Fair and Reasonable Price**

55.     The Debtors, with the assistance of SOLIC: (i) conducted a comprehensive

marketing process with respect to the sale of the Assets in order to maximize value, (ii) solicited

the interest of various potential strategic and financial buyers, and (iii) reviewed and considered

offers for the purchase of the Assets from several potential Purchasers.  Several potential buyers

conducted due diligence with respect to the Assets and two (2) potential bidders provided letters of intent to acquire the Assets.  In addition, the Debtors have proposed Bidding Procedures that will ensure that the highest and best offer for the Assets is attained.

56.      Because the purchase price for the Assets will be determined by the Auction, it will be fair and reasonable as contemplated by section 363 of the Bankruptcy Code.  See, e.g., In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 149 (3d Cir. 1986) ("[g]enerally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt"); In re Nat'l Health & Safety Corp., 1999 WL 703208, at *2 (Bankr. E.D. Pa. Sep. 2, 1999) (citing Abbotts Dairies for the proposition that an auction may be sufficient to establish that one has paid value for the assets of a debtor, and relying upon auction results to verify that the purchase price represented value).

**E.      The Proposed Sale Has Been Negotiated in Good Faith**

57.      Section 363(m) of the Bankruptcy Code provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

58.      Although the Bankruptcy Code does not define the term "good faith purchaser", courts construing section 363(m) of the Bankruptcy Code have stated that "the phrase encompasses one who purchased in 'good faith' and for 'value.'" Abbotts Dairies, 788 F.2d at 147.  To constitute lack of good faith, a court must find fraud or collusion between a purchaser and a debtor in possession, trustee or other bidders. See id. at 147 ("'The requirement that a purchaser act in good faith ... speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a

judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'") (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1197 (7th Cir. 1978)); see, also, In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989) (same); Matter of Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995) (same).

59.     Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach., 572 F.2d at 1198).

60.     As required by section 363(m) of the Bankruptcy Code, the Debtors and Purchaser have engaged in intense, arm's length negotiations. There has been no fraud or collusion.  Furthermore, the Bidding Procedures establish a process whereby interested parties compete to establish the value of the Assets. As such, the Auction will result in a bid for the Assets that represents substantial value to the Debtors' estates because it will provide favorable terms for the disposition of such assets for a price that represents the market value of the assets. See In re Abbotts Dairies, 788 F.2d at 149.   Thus, for the foregoing reasons, the Debtors respectfully request that the Court find that the Purchaser, or to the extent applicable, the Successful Bidder, is entitled to the protections of section 363(m) of the Bankruptcy Code.

**F.     Sale of the Debtors' Assets Should be Free and Clear of Liens**

61.     The Debtors propose to sell the Assets pursuant to section 363(b) and 363(f) of the Bankruptcy Code, which, among other things, authorize a debtor to sell property outside the ordinary course of business, free and clear of any interest, lien, claim, encumbrance or security interest of any other party, including, but not limited to, any administrative expense or priority claim asserted in these Chapter 11 Cases.

62.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(1)     applicable non-bankruptcy law permits the sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See, also, In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. De. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.") (citing Citicorp Homeowners Svcs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988).

63.     Fifth Street has consented to the sale of the Assets pursuant to the Klass APA and has agreed to release its Liens, Claims, Encumbrances or Interests on or in the Assets, thereby satisfying section 363(f)(2).    The Debtors are not aware of any other Liens, Claims, Encumbrances or Interests on or in the Assets; to the extent any are claimed, the Debtors reserve the right to demonstrate at the sale hearing how section 363(f) is satisfied with respect to them.

64.     To facilitate the sale of the Assets, the Debtors propose that any liens, claims and encumbrances asserted against the assets be transferred, and attach, to the sale proceeds received by the Debtors.  All liens on the assets will be satisfied or will attach to the proceeds of the sale of the Assets with the same force, effect and priority as such liens have on the assets, subject to the rights and defenses, if any, of the Debtors and any party in interest with respect thereto.

Accordingly, the Debtors submit that the sale of assets free and clear of liens, claims and encumbrances satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

**G.  Assumption and Assignment of Executory Contracts and Unexpired Leases**

65.    To facilitate and effectuate the sales of the Assets, and depending upon the terms of the Successful Bids received and accepted at the Auction, the Debtors also may seek to assume and assign certain executory contracts and unexpired leases to the purchasers of the Assets to the extent required by Successful Bids at the Auction.

66.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts subject to the approval of the court:

> (a)  Except as provided in . . . subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtors.
>
> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:
>
> (A)  cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform non-monetary obligations under an expired lease of real property, if it is impossible for the trustee to cure such default by performing non-monetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;
>
> (B)  compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease. . . .

(f)(2)  The trustee may assign an executory contract or unexpired lease of the debtor only if —

(A)  the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)  adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

See 11 U.S.C. §§ 365(a), (b)(1), (f)(2).   Accordingly, section 365 of the Bankruptcy Code authorizes the proposed assumptions and assignments of executory contracts and unexpired leases, provided that the defaults under such contracts are cured and adequate assurance of future performance is provided.

67.     It is well settled that the meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but that a contract counterparty is not required to receive an absolute guarantee of future performance.  See, e.g., In re Glycogensys, Inc., 352 B.R. 568, 578 (Bankr. D. Mass. 2006) ("[I]t is appropriate to evaluate the financial condition of the assignee and the likelihood that the non-Debtor party will receive the benefit of its bargain from the assignee"); Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (adequate assurance of future performance does not mean absolute assurance that Debtors will thrive and pay rent); In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (same).

68.     As set forth above, the Bidding Procedures provide that to be a Qualified Bid, any Eligible Bidder must identify each and every executory contract and unexpired lease that the Eligible Bidder desires the Debtors to assume and assign at the closing and provide evidence of

such Eligible Bidder's ability to provide adequate assurance of future performance of such contracts or leases (as required by section 365(f)(2)(B) of the Bankruptcy Code).

69.     In connection with the Sale Hearing, the Debtors will provide evidence that all requirements for the assumption and assignment of the executory contracts and/or unexpired leases proposed to be assigned to the Successful Bidder are satisfied.  Thus, the Debtors respectfully submit that, by the conclusion of the Sale Hearing, assumption and assignment of the executory contracts and/or unexpired leases, if applicable, should be approved.

**H.    The Court Should Fix a Deadline for Objections to (i) the Assumption and Assignment of Executory Contracts and Unexpired Leases (ii) the Corresponding Cure Amounts**

70.     In connection with the assumption and assignment of executory contracts and unexpired leases pursuant to the Sale, the Debtors believe it is necessary to establish a process by which the Debtors and the counterparties to executory contracts and unexpired leases that will be assumed can establish the cure obligations, if any, to be paid in accordance with section 365 of the Bankruptcy Code and for the counterparties of such assumed contracts and leases to assert any objection they may have to the assumption and assignment of same.

71.     As discussed above, no later than  nine (9) days prior to the Sale Hearing, the Debtors will file the Cure Notice which will list, among other things, cure amounts due under all executory contacts and unexpired leases that may be assumed and assigned in connection with a sale of the Assets.  The Debtors propose that any objections (other than objections to adequate assurance of future performance for executory contracts and unexpired leases to be assumed and assigned pursuant to a Successful Bid) to the assumption and assignment of any executory contract or unexpired lease identified on the Practice Summaries must be in writing, filed with the Court, and be actually received on or before the deadline established for filing objections to

the sale and served upon those parties identified for receipt of such notice in the Bidding Procedures Order.

72.     The Debtors request that any party failing to object to the proposed cure amounts contained in the Cure Notice prior to the date that is four (4) days prior to the Sale Hearing be deemed to consent to the treatment of their executory contract or unexpired lease under section 365 of the Bankruptcy Code (including the proposed cure amount) and this Motion.  <u>See</u> <u>Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)</u>, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); <u>Pelican Homestead v. Wooten (In re Gabeel)</u>, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).  Moreover, the Debtors request that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment.  <u>See</u> 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

## <u>REQUEST FOR WAIVER OF STAY</u>

73.     By this Motion, the Debtors seek a waiver of any stay of the effectiveness of the orders approving the relief requested in this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Bankruptcy Rule 6006(d) similarly provides a 14-day stay of the effectiveness of an order authorizing the assignment of an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  For the reasons described above, the Debtors submit that ample cause exists to justify a waiver of the 14-day stays imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply.

53126/0001-10981195v2

**NOTICE**

74.    Notice of this Motion as it relates to the Bidding Procedures will be provided to: (a) the United States Trustee for the District of Delaware, (b) counsel to the Debtors' pre-petition lender proposed and debtor-in-possession lender, (c) the Internal Revenue Service, (d) the Office of the United States Attorney General for the District of Delaware, (e) the Securities & Exchange Commission, (f) the Delaware State Treasury, (g) the Delaware Secretary of State, (h) the parties included on the list of twenty (20) largest unsecured creditors for each of the Debtors; and (i)  all parties who have expressed an interest in purchasing the Assets.  Subsequent notice shall be provided in accordance with the enter Bidding Procedures Order.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is required.

75.    No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Bidding Procedures Order, in substantially the form attached hereto as <u>Exhibit A</u>; (b) enter an Approval Order authorize the Sale of the Assets to the Purchaser or the successful bidder at the Auction in substantially the form attached hereto as <u>Exhibit C</u>; and (c) grant such other and further relief as may be just and proper.

*[Remainder of Page Intentionally Left Blank]*

35

Dated: Wilmington, Delaware
September 19, 2014

**COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.**

*/s/ Nicholas J. Brannick*
J. Kate Stickles (I.D. No. 2917)
Nicholas J. Brannick (I.D. No. 5721)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
kstickles@coleschotz.com
nbrannick@coleschotz.com

and

Michael D. Sirota
Ilana Volkov
Court Plaza North
25 Main Street
Hackensack, NJ 07601
Telephone:  (201) 489-3000
Facsimile:  (201) 489-1536
msirota@coleschotz.com
ivolkov@coleschotz.com

*Proposed Counsel for Debtors and Debtors-in-
Possession*