## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AMCAD HOLDINGS, LLC, et al., | : | Case No. 14-12168 (MFW) |
| | : | |
| Debtors.[1] | : | Jointly Administered |
| | : | |

-------------------------------------------------x

**Hearing Date:  October 15, 2014 at 3:00 p.m. (ET)**
**Objection Deadline: October 8, 2014 at 4:00 p.m. (ET)**

### DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING AND AUTHORIZING IMPLEMENTATION OF KEY EMPLOYEE RETENTION PLAN AND KEY EMPLOYEE INCENTIVE PLAN PURSUANT TO SECTIONS 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE

AmCad Holdings, LLC and American Cadastre, L.L.C. ("**AMCAD**"), the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), by and through their proposed counsel, hereby submit this motion (this "**Motion**") for entry of an order in substantially the form attached hereto as Exhibit C authorizing and approving implementation of a key employee retention plan (the "**KERP**") and key employee incentive plan (the "**KEIP**") for certain employees, pursuant to sections 363(b)(1) and 503(c)(3) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").  In support of the Motion, the Debtors respectfully represent as follows:

### JURISDICTION

1.     The Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of these cases and this Motion in this District is proper under 28 U.S.C.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: AmCad Holdings, LLC (4731) and American Cadastre, L.L.C. (0897).  The corporate headquarters and mailing address for each entity listed above is 13650 Dulles Technology Drive, Suite 400, Herndon, VA 20171.

§§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 363 and 503(c)(3) of the Bankruptcy Code.

## BACKGROUND

**A.    The Chapter 11 Cases**

2.    On September 19, 2014 (the "**Petition Date**"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").  The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of the Chapter 11 Cases, is set forth in the Declaration of Patrick Conley in Support of Chapter 11 Petitions and First Day Motions [Docket No. 5] (the "**Conley Declaration**").

3.    The Debtors continue to manage their assets and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested in the Chapter 11 Cases, and no committees have yet been appointed.

**B.    The Debtors' Business**

4.    AMCAD is a software services company, providing software solutions and document services for both government and commercial enterprises.  AMCAD has historically offered four lines of products and services: (i) software and related services that allow for automation of government records offices, including both land and vital records (the "**Land Records Business**"); (ii) secure and compliant document services (microfilming, conversion, preservation) and compliance, physical document storage and rapid access to physical and electronic documents (the "**Managed Services Business**"); (iii) a case management and document management software solution for electronic filing, primarily to state and county court systems (the "**e-Filing Business**"); and (iv) a case management systems for state and county

2

court systems (the "**Justice Business**").  As described in the Conley Declaration, the Debtors terminated the Justice Business on June 23, 2014.

**C.      The Sale Process**

5.      As further described in the Conley Declaration, in July 2014, the Debtors retained SOLIC Capital Advisors, LLC ("**SOLIC**") as their financial advisor and investment banker to assist the Debtors with an assessment of their financial situation, including the evaluation and execution of strategic alternatives.  As a result of SOLIC's extensive diligence and analysis, the Debtors concluded that the best strategy to maximize value for all constituents was to market their assets for sale.

6.      As a result of SOLIC's efforts, the Debtors entered into an Asset Purchase Agreement with Klass Software Corporation, designating it as the "stalking horse bidder" for the Land Records Business, and on the Petition Date, filed their M*otion of Debtors for (I) Order (A) Approving Bidding Procedures for Sale of Land Records Business Assets of American Cadastre, L.L.C., (B) Scheduling Final Sale Hearing for Sale of Such Assets; (C) Approving Expense Reimbursement and Break-Up Fee and (D) Approving Form and Manner of Notice Thereof, and (II) Order Authorizing and Approving (A) Sale of Such Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases to Successful Bidder* (Docket No. 14).  The Debtors and their professionals continue to negotiate with various parties regarding the sale of the Managed Services Business, e-Filing Business and Justice Business, and anticipate bringing separate motions to sell those assets in the very near term.

7.      Pending the completion of the sales of their assets, and in order to preserve and maximize the value thereof, it is crucial that the Debtors be able to continue operating their businesses in the ordinary course.  In that regard, the Debtors have identified certain employees

3

who, based on their experience, institutional knowledge, expertise, and vendor and customer relationships, are critical to ensuring that the going concern value of AMCAD's business is preserved and optimized.

## RELIEF REQUESTED

8.     By this Motion, the Debtors request entry of an Order approving and authorizing the implementation of the KERP and KEIP pursuant to sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

### A.     The KERP

9.     The Debtors seek authorization to implement the KERP with respect to eleven (11) employees (the "**Key Employees**").  The Key Employees play significant roles in numerous facets of the Debtors' business and are necessary to the continued ordinary course operation thereof pending the critical sale process.   More importantly, these Key Employees are not officers or directors of the Debtors, and thus do not constitute "corporate insiders."  A list of the Key Employees and their positions with the Debtors is attached as Exhibit A. [2]

10.     The KERP affords Key Employees potential bonuses ranging from $10,000-$15,000, for a total of no more than $120,000.  In each case, the bonus is contingent on (i) closing of the sale of the business for which the Key Employee works, (ii) the Key Employee being an active employee on the closing date, and (iii) the Key Employee giving a general release.  If those conditions are met, the bonus will be paid 15 days after the closing of the sale of the business for which the Key Employee works.

---

[2] The identity of the Key Employees and the Key Executives (as defined below), their respective positions, and the proposed KERP and KEIP bonuses are attached as Exhibits A and B, respectively.  To protect the privacy of these individuals and to avoid an adverse impact on employee morale, the Debtors seek to file and keep under seal the lists of the Key Employees and Key Executives pursuant to the Debtors' Motion for Entry of an Order Authorizing Filing Under Seal of Participant Information in Connection with Motion of Debtors for Entry of an Order Authorizing Implementation of Key Employee Retention Plan and Key Employee Incentive Plan filed simultaneously herewith.

53126/0001-11014544v4

11.    The Key Employees were selected because of their unique operational and historical knowledge of the Debtors' businesses and the vital role they play in the Debtors' daily operations.  Without the KERP, the Debtors are seriously concerned that many of the Key Employees would leave to find employment elsewhere, which would substantially impair the Debtors' operations and, in turn, jeopardize the value of their assets that are subject to the sale process.[3]

12.    Ultimately, the Debtors' board determined that the KERP was necessary to maintain stability, allay fears related to the Debtors' financial condition and maximize the value of their assets for the benefit of all creditors.

**B.    The KEIP**

13.    The Debtors also seek authorization to implement the KEIP for two (2) of their key executives (the "**Key Executives**").  A list of the Key Executives and their positions with the Debtors is attached as <u>Exhibit B</u>.

14.    The KEIP is purely an incentive, and not retention, based compensation plan that rewards the Key Executives with a bonus that is based solely on the aggregate Sale Value[4] of the Debtors' assets.  The amount of the bonuses for which each of the Key Executives is eligible ranges between $10,000 to $50,000, depending on the Sale Value.  Thus, the Key Executives are incentivized to ensure that maximum value is obtained for all the Debtors' assets.  Additionally, the bonus is contingent on the Key Executive being an active employee on the closing date of each sale transaction on which the bonus is based, and the Key Employee giving a general release.  If those conditions are met, the bonus will be paid 15 days after the closing of the last

---

[3] Indeed, the Debtors already encountered the loss of one critical employee of the Managed Services Business immediately before the Petition Date.

[4] Sale Value, for purposes of the KEIP, is defined as the sum of cash paid and liabilities assumed by the buyer(s).

sale transaction; provided, however, if the Land Records Business is not sold by **December 26, 2014**, no bonus shall be paid to either of the Key Executives.

15.    The Debtors worked diligently in identifying the appropriate individuals to participate in the KEIP.  The Key Executives were selected because of their unique operational and historical knowledge of the Debtors' businesses, which will enable the Debtors to, among other things, realize the highest possible value for their assets.  The Key Executives are highly accomplished and capable officers, and possess invaluable knowledge regarding the Debtors' operational and financial affairs.

16.    Now that the Chapter 11 Cases have commenced, the Key Executives will be expected to provide, among other things, extensive and indispensable assistance to the Debtors' counsel and advisors, help maintain good relationships with existing customers and other parties, and actively participate in the sale process so that maximum value is achieved.  The Debtors believe the KEIP is appropriately designed to incentivize the Key Executives to continue their substantial efforts in operating the Debtors' business so as to successfully consummate the sale efforts.

### BASIS FOR RELIEF

**A.      The KERP Satisfies the Standards of Sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.**

17.    Section 363(b)(1) of the Bankruptcy Code permits a debtor in possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Use of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a "sound business purpose" for it.  See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a 363(b) application expressly find from the evidence presented before him . . . a good business

6

reason to grant the application"); <u>In re Delaware & Hudson Ry., Co.</u>, 124 B.R. 169, 179 (D. Del. 1991).  Here, the KERP serves a sound business purpose.  As detailed above, the KERP is designed to ensure that the Key Employees remain with the Debtors through the critical sale process.  As noted above, given their fragile state of affairs, the Debtors are very concerned that Key Employees may leave AMCAD's employ and, thus, compromise the Debtors' sale efforts.

18.     Once a debtor articulates a valid business justification for a particular form of relief, the Court reviews the debtor's request under the "business judgment rule."  The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)).

19.     The business judgment rule is recognized in chapter 11 cases and shields the decisions of a debtor's management.  <u>See</u> <u>id.</u>; <u>see also</u> <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under section 363(b) of the Bankruptcy Code when there is a legitimate business justification); <u>In re Montgomery Ward Holding Corp.</u>, 242 B.R. 147, 153 (D. Del. 1999) (affirming bankruptcy court's approval of key employee retention program, stating that "in determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions"); <u>In re Johns-Manville Corp.</u>, 60 B.R. 612, 615-616 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a Debtor's management decisions" and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth).

20.     In addition, section 503(c) of the Bankruptcy Code provides criteria for courts to use in approving certain types of payments to insiders and "other transfers or obligations that are outside the ordinary course of business."  Section 503(c) contains three subsections: (1) a general prohibition against retention plans for insiders; (2) limitations on severance payments to insiders; and (3) standards governing other transfers to certain officers, employees and consultants, among others, that are outside of the ordinary course of business.  See 11 U.S.C. § 503(c).

21.     Neither section 503(c)(1) nor section 503(c)(2) of the Bankruptcy Code is applicable to evaluating the KERP.  By the statute's plain language, section 503(c)(1) of the Bankruptcy Code pertains solely to retention plans of insiders.  None of the Key Employees is an "insider" of the Debtors, within the meaning of section 101(31) of the Bankruptcy Code, as none of the Key Employees is a director, officer, person in control, or general partner of the Debtors, nor is any Key Employee a relative of any director, officer, person in control, or general partner of the Debtors.  See 11 U.S.C. § 101(31).  Section 503(c)(2) addresses only the requirements for severance plans for insiders, and, thus, neither section 503(c)(1) or section 503(c)(2) is applicable to the KERP.

22.     Where neither section 503(c)(1) or 503(c)(2) apply to proposed payments to management and employees, courts may consider whether such proposed payments are permissible under section 503(c)(3).  In re Dana Corp., 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006).  Section 503(c)(3) provides, in relevant part:

(c)     Notwithstanding [section 503(b) of the Bankruptcy Code], there shall neither be allowed, nor paid –

… (3) other transfers or obligations that are outside of the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c)(3).  Courts have generally used a form of the "business judgment" standard to determine whether the "facts and circumstances" standard of section 503(c)(3) of the Bankruptcy Code has been satisfied.  See, e.g., In re Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) Transcript of April 25, 2007 Hearing, at 40:17-41:12 (Bankr. D. Del. Oct. 30, 2007) (noting that section 503(c)(3) standard is "something above the business judgment standard but maybe not much farther above it . . . "); In re Nobex Corp., Case No. 05-20050 (CSS) (Bankr. D. Del. Dec. 1, 2005) (noting that section 503(c)(3) standard is "nothing more than a reiteration of the standard under 363 . . . the business judgment of the debtor . . ."); In re Riverstone Networks, Inc., No. 06-10110 (CSS) (Bankr. D. Del. Mar. 28, 2006) (same); In re Pliant Corp., No. 06- 10001 (MFW) (Bankr. D. Del. Mar. 14, 2006) (same).

23.     Courts in this district routinely approve employee retention plans.  See e.g., In re THQ, Inc., Case No. 12-13398 (MFW) (Bankr. D. Del. May 29, 2013); In re Immunology Partners Inc., Case No. 12-13259 (BLS) (Bankr. D. Del. January 11, 2013) (approving limited employee retention plan in connection with sale process); In re Filene's Basement, LLC, et al., Case No. 11-11351 (KJC) (Bankr. D. Del. Jan. 17, 2012) (approving limited, wind-down employee retention plan).

24.     Here, the KERP satisfies the business judgment standards of sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.  First, as discussed above, the KERP was adopted to ensure the retention of the Key Employees who are necessary for the completion of the sale process.  Absent the relief requested herein, the Key Employees would likely, and understandably, begin to search for alternative employment opportunities promising long-term stability, as each of the Key Employees possesses transferrable and in-demand skills.  Such an

9

outcome would be extremely damaging to the Debtors, who, for this reason alone, might be unable to consummate a sale of their assets to a third-party.

25.     Second, the overall cost of the KERP, which will be no more than $120,000, is reasonable in light of the size of the Debtors' estates.  Moreover, the cost of the KERP is reasonable when compared with the potential harm to the Debtors' estates if the Key Employees are not retained.  Specifically, the loss of the specialized skills and institutional knowledge of the Key Employees would be damaging to the Debtors and their ability to complete a sale of their assets.  It is highly unlikely that the Debtors could locate, much less hire, replacements for the Key Employees, given the Debtors' filing of the Chapter 11 Cases and the expedited sale timeframe.  The costs, delay and disruption associated with an attempt to hire outside personnel and train them in the Debtors' operations during the sale process would far outweigh the cost of the KERP.

26.     Third, the Debtors also expect the KERP to have positive effects on the Key Employees' morale and their productivity, as the adoption of the KERP sends a message to the Key Employees that their efforts during the sale process are valued and will be rewarded. Moreover, approval of the KERP will provide the Key Employees with a greater sense of financial security, thereby eliminating a potential distraction that could adversely affect performance.  Accordingly, the KERP is designed to ensure that the Key Employees remain dedicated and committed to the success of the Debtors and their sale process, and satisfies the business judgment standard under sections 363(b) and 503(c)(3) of the Bankruptcy Code.

53126/0001-11014544v4

**B.**     **The KEIP is Authorized Under Section 503(c)(3) of the Bankruptcy Code as an Incentive-Based Compensation Plan that Satisfies the Business Judgment Rule.**

27.     The Court should also approve the proposed KEIP because it is purely an incentive-based compensation plan, and its implementation falls squarely within the Debtors' sound business judgment and satisfies section 503(c)(3) of the Bankruptcy Code.

28.     Here, the KEIP meets all of the above criteria of the business judgment rule, as applied under section 503(c)(3).   First, the KEIP is directly related to the Debtors' goal of selling their assets during the Chapter 11 Cases at their maximum price, because the proposed bonus is based on a percentage of the aggregate Sale Value.   Thus, the Key Executives' interest in receiving compensation is directly aligned with the Debtors' interest in maximizing the value of their assets.   The Key Executives will have to work diligently to earn the KEIP bonus, and will forfeit any payouts if they voluntarily terminate their employment with the Debtors before the last sale transaction has closed.

29.     Second, the cost of the KEIP – a total maximum of $60,000 – is reasonable and is only a small fraction of the proceeds to be received from the Land Records sale and the other sales the Debtors are working hard to finalize and bring before this Court.

30.     Third, the KEIP is fair and reasonable because it applies equally to both its participants.

31.     Fourth, the KEIP is typical for chapter 11 debtors seeking to sell their assets in an orderly and value maximizing process, such as the case here.

32.     Fifth, in identifying the Key Executives and determining the amount of the KEIP bonuses, the Debtors' Board conducted thorough due diligence and obtained advice from professionals.   Additionally, the Debtors' primary secured lender fully supports the KEIP (as well as the KERP).

53126/0001-11014544v4

33. Lastly, the KEIP is not a retention-based compensation plan, and is thus not subject to the restrictions of section 503(c)(1) of the Bankruptcy Code. The KEIP is an incentive-based plan that rewards its beneficiaries for achieving higher sale prices, that will maximize the value of the Debtors' assets for the benefit of all creditors. The KEIP does <u>not</u> compensate the Key Executives simply to remain in the Debtors' employ through the Chapter 11 Cases. Accordingly, section 503(c)(1) does not apply.

34. Notably, targeted incentive programs such as the KEIP are routinely approved by Court in this District. <u>See</u> <u>e.g.</u>, <u>Furniture Brands Int'l, Inc.</u>, Case No. 13-12329 (CSS) (Oct. 11, 2013); <u>In re THQ, Inc.</u>, Case No. 12-13398 (MFW) (Bankr. D. Del. May 29, 2013); <u>In re Real Mex Restaurants, Inc.</u>, Case No. 11-13122 (BLS) (Bankr. D. Del. Dec. 19, 2011); <u>In re Eddie Bauer, Inc.</u>, Case No. 09-12099 (MFW) (Bankr. D. Del. July 22, 2009); <u>In re Anchor Blue Retail Group, Inc.</u>, Case No. 09-11770 (PJW) (Bankr. D. Del. June 30, 2009); and <u>In re Drug Fair Group, Inc.</u>, Case No. 09-10897 (BLS) (Bankr. D. Del. May 4, 2009).

35. Accordingly, the Debtors believe the KEIP satisfies the business judgment rule and should be approved under section 503(c)(3) of the Bankruptcy Code.

## NOTICE

36. Notice of this Motion will be given to: (a) the United States Trustee for the District of Delaware; (b) the twenty largest unsecured creditors for each of the Debtors; (c) counsel to the Debtors' primary secured lender, and (d) all parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

37. No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto as Exhibit C, granting the Motion and such other and further relief as may be just and proper.


Dated: Wilmington, Delaware
September 24, 2014

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**

*/s/  Nicholas J. Brannick*
J. Kate Stickles (I.D. No. 2917)
Nicholas J. Brannick (I.D. No. 5721)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
kstickles@coleschotz.com
nbrannick@coleschotz.com

and

Michael D. Sirota
Ilana Volkov
Court Plaza North
25 Main Street
Hackensack, NJ 07601
Telephone:  (201) 489-3000
Facsimile:  (201) 489-1536
msirota@coleschotz.com
ivolkov@coleschotz.com

*Proposed Counsel for Debtors and Debtors-in-Possession*

13